Rosemary M. Rivas (State Bar No. 209147)
rrivas@finkelsteinthompson
Danielle A. Stoumbos (State Bar No. 264784)
dstoumbos@finkelsteinthompson.com
**FINKELSTEIN THOMPSON LLP**
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

*Attorneys for Individual and Representative*
*Plaintiff Jerome C. Broering*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEROME C. BROERING, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| STEVEN C. OLDHAM, KIRK C. DOYLE, GUY R. GIBSON, ROBERT D. KITTREDGE, JOHN R. ROBERTS, III, TIMOTHY D. TARON, ROGER J. VALINE, CONSOLIDATED COMMUNICATIONS HOLDINGS, INC., SUREWEST COMMUNICATIONS, WH ACQUISITION CORP., and WH ACQUISITION II CORP., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Jerome C. Broering ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his counsel, alleges the following:

## SUMMARY OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff on behalf of himself and the public shareholders of SureWest Communications ("SureWest" or the "Company") common stock for breach of fiduciary duties in connection with the proposed sale of the Company to Consolidated Communications Holdings, Inc. ("Consolidated") and its affiliates (the "Proposed Transaction") for approximately $340.9 million, exclusive of debt.  The Proposed Transaction is expected to close in the third quarter of 2012, subject to certain customary conditions, including approvals from federal and California regulators, and approval by both SureWest and Consolidated shareholders.

2.      Before the market opened on February 6, 2012, SureWest and Consolidated issued a joint press release announcing that they had entered into a definitive Agreement and Plan of Merger on February 5, 2012 (the "Merger Agreement").

3.      Pursuant to the Merger Agreement, SureWest shareholders can elect to exchange each share of SureWest common stock either for $23.00 in cash ("Cash Consideration") or for the number of shares of Consolidated common stock of equivalent value, based on Consolidated's average trading price for the 20-day period ending two days prior to acquisition's closing (the "Stock Consideration"). The Cash Consideration and the Stock Consideration, either individually or together, are periodically referred to hereafter as the "Merger Consideration."  Overall elections are subject to proration so that 50% of the SureWest shares will be exchanged for cash and 50% for stock.   The Stock Consideration is subject to a 15% collar mechanism so that there will be a maximum exchange ratio of 1.40565 shares of Consolidated stock for each SureWest share and a minimum exchange ratio of 1.03896 shares of Consolidated stock for each SureWest share.

4.      As a result of the close-knit relationship between SureWest's President, Chief Executive Officer ("CEO") and director, Defendant Steven C. Oldham ("Oldham"), and Consolidated's President, CEO and director, Robert J. Currey ("Currey"), both of whom serve on the board of directors of the United States Telecom Association ("USTelecom Association") and have known each other for many

1

years, the Company's Board of Directors (the "Board"), identified *infra*, was prejudiced in favor of the Proposed Transaction with Consolidated and failed to provide a level playing field to potential competing buyers to the detriment of SureWest's shareholders. Indeed, Oldham and Currey orchestrated and drove negotiations throughout the process leading up to the Proposed Transaction. The two admittedly had numerous off-the-record discussions regarding a merger between SureWest and Consolidated, thereby tilting the process towards Consolidated. The Board, with full knowledge of this material conflict, did not even consider creating a special committee to oversee negotiations and, instead, relied on Oldham's dealings with Currey. Ultimately, Company A submitted a higher bid than Consolidated. Oldham quickly informed Currey and Consolidated returned with a slightly higher offer. Without informing Company A of Consolidated's higher offer and creating a competitive bidding process as any Board that was intent on maximizing shareholder value would do, the Board, at the recommendation of a conflicted Oldham, approved the merger without informing Company A of Consolidated's new bid.

5.      This is not surprising given the fact that management will stay on with the combined company. In addition to their future employment with Consolidated, Oldham and his conflicted management team stand to receive substantial sums of cash and equity benefits if the Proposed Transaction closes. In particular, Oldham will receive more than $8 million in cash and equity awards, plus more than $9 million from the accelerated vesting of unvested stock options, restricted stock units and restricted stock awards.

6.      As described below, the Proposed Transaction is patently opportunistic and does not reflect the intrinsic value of the Company as a takeover candidate, as SureWest's revenue has steadily grown throughout 2011, and the Company is poised for continued long-term growth. Notably, for the last three years, as Consolidated has experienced a steady decline in total operating revenues, SureWest's total operating revenues have grown nearly 8%, from $230.3 million in 2008 to $248.1 million in 2011.

7.      Defendants have agreed to lock-up the deal with a number of coercive clauses, including, *inter alia*: (i) a "no solicitation" clause that prevents SureWest from soliciting and, subject to minimal

2

exceptions, from providing confidential information to potential alternative bidders; (ii) a provision requiring SureWest to pay Consolidated a termination fee of $14,675,000 (or 4.3% of the overall equity value of the Proposed Transaction) in the event that the Company terminates the deal in favor of a superior offer from an unsolicited buyer; and (iii) information rights that required the Company to provide Consolidated with the identity of any competing bidders, as well as the material terms of any competing offer.   The collective effect of these provisions is to chill any potential post-deal market check.

8.    On March 28, 2012, Consolidated filed a Form S-4 Registration Statement ("Registration Statement") with the Securities and Exchange Commission ("SEC") elaborating on the terms of the Proposed Transaction, as well as describing the sales process and the fairness opinions of SureWest's and Consolidated's respective financial advisers.  As described *infra*, the Registration Statement fails to provide SureWest shareholders with material information concerning, *inter alia*, the sales process and the financial advisers' respective methods and analyses to determine fairness and reasonableness of the Proposed Transaction.   Without imminent judicial intervention, Plaintiff and the other SureWest shareholders will suffer irreparable harm as they must decide whether to cast their votes without all material information necessary to make an informed vote on the Proposed Transaction.

9.    As described in more detail herein, in pursuing the sale of SureWest to Consolidated, Defendants breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing to SureWest shareholders, and/or aided and abetted such breach, by failing to maximize shareholder value and by failing to disclose all material information concerning the Proposed Transaction.   As set forth herein, Plaintiff seeks to require Defendants to disclose all material information concerning the Proposed Transaction and to enjoin Defendants from consummating the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' wrongful conduct.

CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

11.     Venue is proper in this district because the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred largely in this district.   One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

12.     This Court has jurisdiction over SureWest because SureWest is a citizen of California by virtue of being incorporated in California and having its principal place of business in California, located at 8150 Industrial Avenue, Building A, Roseville, California 95678.

**PARTIES**

13.     Plaintiff is and, at all times relevant hereto, was a shareholder of SureWest.   Plaintiff is a resident of the State of Ohio.

14.     Defendant SureWest is a California holding company, headquartered in Roseville, California.   Originally founded in 1914 by William Doyle as the Roseville Telephone Company, the Company is now an integrated communications provider.   Through its operating subsidiaries, including SureWest Broadband, SureWest TeleVideo, SureWest Kansas, Inc., SureWest Telephone, and SureWest Long Distance, the Company provides a wide range of telecommunications, digital video, internet, data and other facilities-based communications services to approximately 130,000 residential subscribers and 15,700 commercial businesses in Northern California and in the greater Kansas City, Kansas and Kansas City, Missouri areas.

15.     Defendant Consolidated, a Delaware company, is an established rural local exchange carrier ("RLEC").   It offers a wide range of telecommunications services to residential and business customers in Illinois, Texas and Pennsylvania, including local and long-distance services; high-speed broadband Internet access ("DSL"); standard and high-definition digital television ("IPTV"); digital

4

telephone service ("VOIP"); custom calling features; private line services; carrier access services; network capacity services over regional fiber optic networks; directory publishing and Competitive Local Exchange Carrier ("CLEC") services.  As of December 31, 2010, it had 237,141 local access lines, 106,387 DSL lines, 29,236 IPTV subscribers and an estimated 81,090 CLEC access line-equivalents.  Consolidated also operates two complementary businesses: one of which provides telephone services to correctional facilities, and the other engaged in equipment sales.  Consolidated's principal place of business is located at 121 South 17th Street, Mattoon, Illinois 61938.

16.    Defendants WH Acquisition Corporation ("MergerSub I") and WH Acquisition II Corporation ("MergerSub II," together with MergerSub I, "MergerSubs"), both California corporations, are wholly owned subsidiaries of Consolidated and were created for the purpose of facilitating the Proposed Transaction. All references to "Consolidated" shall include the MergerSubs.

17.    Defendant Oldham has served as SureWest's President and CEO since January 1, 2006, and has been a member of the Board since January 2004.  Upon information and belief, defendant Oldham is a citizen of Nevada.

18.    Defendant Kirk C. Doyle ("Doyle") has served as the Company's Chairman since 2003, succeeding his late father, and as a director since August 2000.  He is an ex-officio member of the Board's Nominating and Governance Committee.  The Doyle family founded SureWest almost 100 years ago and still retains a significant financial stake in the Company.  Upon information and belief, defendant Doyle is a citizen of California.

19.    Defendant Guy R. Gibson ("Gibson") has served on the Board since 2003 and is a member of its Compensation Committee and the Nominating and Governance Committee.  Upon information and belief, defendant Gibson is a citizen of California.

20.    Defendant Robert D. Kittredge ("Kittredge") has served on the Board since 2005 and serves as chair of its Audit Committee.  Upon information and belief, defendant Kittredge is a citizen of California.

21.    Defendant John R. Roberts III ("Roberts") has served on the Board since 1993 and serves as chair of its Compensation Committee and as a member of its Audit Committee.  He is also a member

of the SureWest Political Action Committee Board. Upon information and belief, defendant Roberts is a citizen of California

22.     Defendant Timothy D. Taron ("Taron") has served on the Board since November 2000 and serves as chair of its Nominating and Governance Committee and a member of the Compensation Committee. He is also president of the SureWest Political Action Committee Board. Upon information and belief, defendant Taron is a citizen of California.

23.     Defendant Roger J. Valine ("Valine") has served on the Board since 2004 and serves as a member of both its Audit and Nominating Committee and its Governance Committee. He is a member of the SureWest Political Action Committee Board. Upon information and belief, defendant Valine is a citizen of California

24.     Defendants named above in ¶¶ 17-23 are collectively referred to herein as the "Individual Defendants" or the "Board."

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and all public shareholders of SureWest common stock who have been harmed by Defendants' actions as described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the immediate families of the Individual Defendants.

26.     This action is properly maintainable as a class action.

27.     The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, there were over 14.3 million shares of SureWest common stock issued and outstanding as of February 3, 2012. According to a January 26, 2012 SureWest press release, the stock is held by approximately 9,500 shareholders. Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

28.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*:

6

(i)      whether the Individual Defendants have fulfilled and are capable of fulfilling their fiduciary duties owed to Plaintiff and the Class, including, but not limited to, the duties of undivided loyalty, independence, due care, honesty and good faith;

(ii)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and other Class members;

(iii)    whether the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, candor and fair dealing;

(iv)     whether Defendants engaged in self-dealing in connection with the Proposed Transaction;

(v)      whether the Registration Statement contains certain insufficient and deficient disclosures;

(vi)     whether Defendants unjustly enriched themselves and other insiders or affiliates of SureWest and/or Consolidated by approving the Proposed Transaction;

(vii)    whether Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other offers for the Company or its assets;

(viii)   whether Defendants aided and abetted the Individual Defendants' breaches of fiduciary duties of candor, due care, good faith and loyalty with respect to Plaintiff and the Class;

(ix)     whether the Merger Consideration to be paid by Consolidated to Plaintiff and the Class in connection with the Proposed Transaction is unfair and inadequate;

(x)      whether Plaintiff and the Class will be irreparably harmed if Defendants are not enjoined from continuing the conduct described herein, or alternatively, whether they have suffered compensable damages; and

(xi)     whether Plaintiff and the Class are entitled to injunctive relief, damages, or other relief.

7

29.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

30.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

31.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

**THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

33.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of SureWest and owe them unwavering duties of good faith, fair dealing, undivided loyalty and full and candid disclosure.

34.     In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive and disclose all material information concerning the proposed change of control to enable the shareholders to make informed

8

voting decisions. To diligently comply with this duty, as directors of SureWest, the Individual Defendants have fiduciary obligations to:

   (a) undertake an appropriate evaluation of SureWest's net worth as a merger/acquisition candidate;

   (b) act independently to protect the interests of the Company's public shareholders;

   (c) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts do exist, to ensure that all conflicts are resolved in the best interests of SureWest's public shareholders; and

   (d) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of SureWest.

   35. Accordingly, when undertaking a change of control transaction, the Independent Directors may not take any action that:

   (a) adversely affects the value provided to the corporation's shareholders;

   (b) contractually prohibits them from complying with or carrying out their fiduciary duties;

   (c) discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

   (d) will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

   36. As Plaintiff alleges herein, the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated their duties owed to Plaintiff and the other public shareholders of SureWest to maximize shareholder value in a sale of the Company. Moreover, the Individual Defendants failed to provide shareholders with all information necessary to make informed decisions in connection with the Proposed Transaction. As a result of the Individual Defendants' divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their SureWest common stock in the Proposed Transaction.

37.     Because the Individual Defendants continue to knowingly or recklessly breach their duties of loyalty, good faith and independence in connection with the Proposed Transaction, the burden of proving the inherent or entire fairness of the Proposed Transaction, including all aspects of its negotiation, structure, price and terms, is placed upon Defendants as a matter of law.

## CONSPIRACY, AIDING AND ABBETTING AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.   In addition to their wrongful conduct giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in breach of their respective duties, as herein alleged.

39.     Each Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.   Defendants' acts of aiding and abetting include the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## SUBSTANTIVE ALLEGATIONS

### A.     The Company's Long-Term Prospects Are Excellent

40.     SureWest is a leading integrated communications provider and broadband leader in the markets it serves, with about 800 employees and approximately 282,000 connections.   The Company is poised for long-term growth.

41.     As the table below illustrates, important financial metrics of the Company are improving and the value of the Company is steadily increasing (all references to dollars are in thousands, except per share amounts):

| | 2010 | 2009 | 2008 | %Change 2010 vs. | 2009 vs. |
| --- | --- | --- | --- | --- | --- |

CLASS ACTION COMPLAINT

| | | | | 2009 | 2008 |
|---|---:|---:|---:|---:|---:|
| **Operating revenues** | | | | | |
| Broadband | $174,546 | $161,222 | $135,341 | 8% | 19% |
| Telecom | 68,953 | 80,478 | 95,032 | (14) | (15) |
| Operating revenues | 243,499 | 241,700 | 230,373 | 1 | 5 |
| **Income (loss) from operations** | | | | | |
| Broadband | (14,793) | (23,550) | (27,261) | 37 | 14 |
| Telecom | 29,987 | 37,123 | 42,402 | (19) | (12) |
| Income from operations | 15,194 | 13,573 | 15,141 | 12 | (10) |
| **Income (loss) from continuing operations** | | | | | |
| Broadband | (12,873) | (20,782) | (23,684) | 38 | 12 |
| Telecom | 16,228 | 21,449 | 24,510 | (24) | (12) |
| Income from continuing operations | 3,355 | 667 | 826 | 403 | (19) |
| **Net cash provided by operating activities from continuing operations** | 63,553 | 71,842 | 50,778 | (12) | 41 |
| **Adjusted EBITDA** | | | | | |
| Broadband | 37,473 | 25,590 | 12,899 | 46 | 98 |
| Telecom | 45,038 | 52,308 | 56,340 | (14) | (7) |
| Adjusted EBITDA | 82,511 | 77,898 | 69,239 | 6 | 13 |
| **Free cash flow** | | | | | |
| Broadband | (7,196) | (21,398) | (49,930) | 66 | 57 |
| Telecom | 21,146 | 24,459 | 20,527 | (14) | 19 |
| Corporate | (1,330) | (1,000) | (1,233) | (33) | 19 |
| Free cash flow | 12,620 | 2,061 | (30,636) | 512 | 107 |

42.   In fact, on June 14, 2011, SureWest announced that as of June 24, 2011, its stock would be joining the Russell 3000 Index, which also meant automatic inclusion for the stock in the Russell 2000 Index. Russell determines membership for its equity indexes primarily by objective, market-capitalization rankings and style attributes.   In the SureWest press release announcing this news, Defendant Oldham commented:

> SureWest has rejoined the Russell 2000 Index based on our continued growth and strong performance. . . . The decision to expand and grow our core Broadband segment has helped place us in the solid financial position we are in today. The demand for our fiber [ ]services from both residential and business customers has enabled us to continue to build out our network and validates our expectations for strong growth moving forward. We are very confident in our growth plan and anticipate generating long-term sustainable free cash flow and additional value for our shareholders.

43.   On July 8, 2011, the Company proclaimed that "overall satisfaction among its fiber-to-the-home ("FTTH") subscribers reached a new high in 2011, with 74 percent stating they are 'very

satisfied,' in a new study conducted by the FTTH Council." Defendant Oldham touted the Company's achievement:

> Due to the superior performance and reliability of our fiber network, we consistently experience high satisfaction rates among our customers, and are not surprised by the results of the FTTH Council study. . . . We have been on the forefront of FTTH technology for a decade and this study further reinforces our strategy of growing the company by offering best-in-class broadband services.
> Fiber expansion is part of our long-term strategy and we are in the process of building 15,500 new fiber homes in Olathe, Kansas this year. The high customer satisfaction results speak to the demand we are currently seeing with the new homes, which have experienced early penetration rates as high as 30 percent in some areas. We will continue to drive technological advancements in our industry and expand our FTTH networks to fulfill our customers' ever-increasing need for additional bandwidth.

44.    On July 28, 2011, SureWest announced the Company's results for the second quarter ended June 30, 2011.  As compared with the same reporting period in 2010, among other things, SureWest achieved a 1% growth in total revenue – driven by a 7% growth in its Broadband segment revenue and a 12% increase in adjusted EBITDA.

45.    On October 27, 2011, SureWest announced its results for the third quarter ended September 30, 2011.  The Company reported that as compared with the same quarter in 2010, it had achieved a 3% year-over-year revenue growth, a 9% increase in Broadband segment revenues, and a 15% increase in adjusted free cash flow.  Defendant Oldham discussed the drivers of these results and the success of the Company:

> We continue to grow the company effectively by adding new residential and business subscribers, reducing churn and increasing revenues from our existing customers. SureWest maintains a strong presence in our markets due to our anticipation of the demand for high bandwidth Broadband services. As a result, we have been able to overcome the industry-wide decline in revenues from losses in traditional access lines, telephone minutes of use and regulatory support revenues.
> In late July we launched a new residential advertising campaign in the Sacramento market designed to create more awareness in our service area. The campaign helped drive new subscriber and RGU growth that is expected to continue in the fourth quarter. Due to its success in attracting higher margin subscribers with less discounting, we will expand the campaign into the Kansas City market in 2012. We continuously monitor the reaction to our marketing efforts from both our customers and competitors, and will adjust tactics as necessary in order to gain market share.
> Revenue growth from wireless carrier backhaul in the Sacramento market also provided a significant impact, and we are now billing for 280 connections that generate $3.2 million in annualized revenues. We have contracts in place for 390 connections and anticipate

12

over $4 million in annualized revenues when those sites are active. Our business customer growth in the Kansas City market is continuing and we are adding more medium- and large-sized companies, which helped drive a 7% year-over-year increase in ARPU in that region to $685 per month.

In the first quarter of 2012, after the final phase out of the California High Cost Fund subsidy, we will have reduced revenues from regulatory supports from 56% of adjusted EBITDA in 2005 to roughly 11%. We have greatly reduced the risk to our shareholders from future regulatory and policy changes in the industry without compromising the superior experience we provide to our customers. As we grow, we remain focused on increasing long-term cash flow and shareholder return.

46.     On October 26, 2011, SureWest announced that it would increase its quarterly dividend from $0.08 per share to $0.10 per share beginning on December 15, 2011, the next date that the quarterly dividend was payable to SureWest shareholders. On January 26, 2012, SureWest announced that it would maintain its quarterly cash dividend at $0.10 per share payable on March 15, 2012.

47.     On November 28, 2011, SureWest announced that it successfully amended its credit agreement to lower its interest rate, providing an interest expense savings of up to $1 million in 2012.

**B.     Consolidated's Declining Prospects**

48.     In contrast to SureWest's excellent outlook, as the table below reflects, important metrics for Consolidated have been declining for the last three years:

| | | Year ended December 31, | |
| --- | --- | --- | --- |
| (In millions, except per share amounts) | 2011 | 2010 | 2009 |
| Telephone operations revenues | $ 342.6 | $ 349.6 | $ 364.6 |
| Other operations revenues | 31.7 | 33.8 | 41.6 |
| Total operating revenues | 374.3 | 383.4 | 406.2 |
| Income from operations | 62.6 | 65.9 | 70.7 |
| Income before income taxes and extraordinary item | 41.8 | 42.2 | 38.3 |
| Net income | 27.0 | 33.2 | 25.9 |
| Net income per common share—basic | 0.88 | 1.09 | 0.84 |
| Basic weighted-average number of shares | 29,600 | 29,490 | 29,396 |

CLASS ACTION COMPLAINT

| Income per common share—diluted: (3) | | | |
|---|---|---|---|
| Income per common share before extraordinary item | **0.88** | 1.09 | 0.84 |
| Extraordinary item per share | **—** | — | — |
| Net income per common share—diluted | **0.88** | 1.09 | 0.84 |

49.     Specifically, nearly all sources of Consolidated's revenue have been declining for the last three years:

| (in millions, except for percentages) | 2011 | | 2010 | | 2009 | |
|---|---|---|---|---|---|---|
| | $ | % of Revenues | $ | % of Revenues | $ | % of Revenues |
| Telephone operations: | | | | | | |
| Local calling services | **86.9** | **23.2** | 91.9 | 24.0 | 97.2 | 23.9 |
| Network access services | **80.5** | **21.5** | 81.7 | 21.3 | 86.3 | 21.3 |
| Subsidies | **45.4** | **12.1** | 48.7 | 12.7 | 56.0 | 13.8 |
| Long-distance services | **15.9** | **4.2** | 18.0 | 4.7 | 20.4 | 5.0 |
| Data, Internet and video services | **80.3** | **21.5** | 75.2 | 19.6 | 68.1 | 16.8 |
| Other services | **33.6** | **9.0** | 34.1 | 8.9 | 36.6 | 9.0 |
| Total telephone operations | **342.6** | **91.5** | 349.6 | 91.2 | 364.6 | 89.8 |
| Other operations | **31.7** | **8.5** | 33.8 | 8.8 | 41.6 | 10.2 |
| Total operating revenue | **374.3** | **100.0** | 383.4 | 100.0 | 406.2 | 100.0 |

50.     In light of Consolidated's declining prospects vis-à-vis SureWest's excellent outlook, and the fact that, under the Merger Agreement, the total Cash Consideration provided is limited to 50% of the overall consideration, so that if cash elections are oversubscribed, each SureWest shareholder electing to receive cash consideration will only be entitled to receive a pro rata share of such cash consideration and the rest in the form of Consolidated stock, the Merger Consideration is inadequate and the Proposed Transaction is not in the best interest of SureWest shareholders.

14

## C.     The Biased Sales Process Failed to Maximize Shareholder Value

51.     According to the Registration Statement, SureWest's Board and management undertook an initiative to evaluate the status and the stand-alone outlook of the Company's business in early 2009. The Board determined to assess strategic alternatives for SureWest on an ongoing basis at this time and "authorized management to explore a range of strategic alternatives for the Company, including in particular: (1) executing on its current stand-alone organic growth plan ("status quo"), (2) pursuing a growth strategy focused on opportunistic acquisitions, (3) entering into a combination with another industry participant and (4) an outright sale of the business or portions of the business."

52.     In the third quarter of 2009, SureWest instructed its financial advisor UBS Securities LLC ("UBS") to begin "an initial exploratory process to assess interest from a number of parties that representatives of UBS and SureWest viewed as potential strategic partners, including Consolidated." It appears from the Registration Statement that the Board did not even consider engaging other financial advisors.   Instead, SureWest engaged its long-term advisor, UBS, with which the Company had a longstanding relationship and to which SureWest presumably has paid millions of dollars in fees.

53.     Without providing any details concerning the exchanges between SureWest and Consolidated during the second half of 2009, such as the persons involved in discussions between the two companies or the number of meetings held, the Registration Statement simply states: "During the exploratory process, Consolidated expressed an interest in a possible transaction with SureWest, and on December 1, 2009, Consolidated executed a confidentiality agreement, which included a two-year 'standstill' provision restricting Consolidated's ability to purchase SureWest shares or engage in other actions which might affect control of SureWest."

54.     On February 3, 2010, Consolidated made an offer to purchase SureWest in a stock-for-stock transaction with an indicated range from $10.00 to $12.00 per SureWest share, which would have provided an implied exchange ratio of 0.593 to 0.712.  The Registration Statement does not state that, based on the closing price of SureWest's stock on February 3, 2010, this would have provided SureWest shareholders with a premium of up to almost 49% - higher than the premium offered by the Merger

15

CLASS ACTION COMPLAINT

Consideration based on the closing price of SureWest shares on February 3, 2012 – the last trading day before the deal was announced.

55.     Less than two weeks later, on February 15, 2010, following discussions between SureWest and Consolidated, Consolidated revised its proposal to purchase SureWest in a stock-for-stock transaction at an exchange ratio of 0.911 of Consolidated stock per SureWest share. The proposal also requested that SureWest agree to a 45-day exclusivity period to allow Consolidated to proceed with confirmatory due diligence and negotiate a merger agreement. With respect to the revised February 15, 2010 offer, the Registration Statement fails to inform shareholders that the implied cash price based on the 0.911 exchange ratio and the February 12, 2010 closing price of Consolidated stock would have been approximately $14.92 per SureWest share, which would have provided SureWest shareholders with an impressive premium of nearly 82%.

56.     Following the receipt of Consolidated's February 15, 2010 proposal, the Board met several times to discuss the proposal and exclusivity period. Concurrently, UBS met with Consolidated's financial advisor, Wells Fargo Securities, LLC ("Wells Fargo"), to discuss and negotiate the exclusivity agreement and discuss the exchange ratio. On March 8, 2010, SureWest and Consolidated entered into an exclusivity agreement providing for a 21-day exclusivity period, which expired March 29, 2010, and a non-binding understanding on an exchange ratio of 0.911 of Consolidated common stock per share of SureWest common stock, subject to further due diligence. Shortly after entering into the exclusivity agreement, the two companies conducted extensive diligence on each other.

57.     According to the Registration Statement, following several diligence meetings and discussions, "SureWest and Consolidated mutually agreed to terminate discussions regarding a possible business combination transaction due to the relative movement in the trading prices of SureWest's and Consolidated's common stock during the exclusivity period, and on March 30, 2010, access to SureWest's data room was disabled for Consolidated and its representatives." The Registration Statement, however, does not disclose how and why the relative movement of the stock prices affected their decision to terminate discussions.

16

58.     Between late March 2010 and late April 2010, SureWest continued to discuss and pursue other strategic alternatives but had "no substantive contacts" with Consolidated. The Registration Statement failed to disclose sufficient information concerning these "other strategic alternatives" and the number of parties that were in discussion with SureWest at this time.

59.     In late April 2010, Consolidated indicated that it was still interested in pursuing a transaction with SureWest. Consolidated president and CEO Currey sent an email to Defendant Oldham on May 15, 2010 and offered to purchase SureWest at an indicated price of $13.50 per share in a stock-for-stock transaction, subject to a collar to provide a fixed value for up to a 10% change in the trading price of Consolidated's common stock. After reviewing this proposal, the Board "determined to pursue other strategic alternatives that it believed could provide a higher value to SureWest's shareholders than Consolidated's proposal."

60.     From late May 2010 until August 2011, the two companies did not engage in substantive discussions concerning a possible business combination transaction, though Currey continued to indicate to Defendant Oldham that Consolidated remained interested in pursuing a transaction with SureWest. Instead, SureWest continued to review and pursue a number of strategic alternatives, including exploring a possible sale of the Kansas City and California portions of the business separately to different purchasers and the possible purchase of complementary businesses. Ultimately, the Board determined that these opportunities were not in the best interests of SureWest shareholders at that time. The Registration Statement should inform investors more fully of each strategic alternative being pursued by SureWest between late May 2010 and August 2011.

61.     On June 29, 2011, the financial advisor of a private equity-backed company in SureWest's industry ("Company A") contacted SureWest senior management to express Company A's interest in meeting with SureWest at an upcoming industry conference to discuss potential business combinations.

62.     On July 27, 2011, Company A executed a confidentiality agreement, which included a two-year "standstill" provision. On August 15, 2011, members of senior management of SureWest held

17

an introductory meeting with members of Company A's senior management while attending an industry conference.

63.   On August 16, 2011, at the same industry conference, Defendant Oldham and Currey discussed again the possibility of a possible transaction between SureWest and Consolidated. Following that conversation, in an August 18, 2011 e-mail to Oldham, Currey proposed an indicated acquisition price of $18.00 per share in a stock-for-stock transaction, and indicated that Consolidated would consider providing a small portion of cash as consideration.  The Registration Statement fails to alert investors that the August 18, 2011 proposal would have provided SureWest shareholders with a premium of nearly 54% based on SureWest's closing price on the day of the proposal.

64.   At a regular Board meeting held on August 24, 2011, after discussing Consolidated's August 18, 2011 proposal and reviewing various strategic alternatives and discussions with other parties with UBS, including discussions with Company A, the Board "determined that the consideration Consolidated proposed did not provide sufficient value to the SureWest shareholders, but authorized management to continue discussions with Consolidated."   Other than Consolidated's proposal and the discussions with Company A, the Registration Statement fails to describe the other strategic alternatives being considered by SureWest and the nature of the discussions with the "other parties" during this time.

65.   Driven by Oldham's relationship with Currey, the sales process continued to favor a deal with Consolidated.  On September 21 and 22, 2011, members of senior management of SureWest met with members of senior management of Consolidated to discuss each of their respective companies in more detail and conduct preliminary diligence. Following the meeting, members of management exchanged further financial and operational information.  During this time, preliminary conversations continued between SureWest and Company A, and Company A commenced its diligence activities in October 2011.

66.   On October 6, 2011, Oldham and Currey met in Salt Lake City, Utah to continue discussions regarding a possible transaction between the two companies. Following this meeting, the two companies continued to exchange diligence information.  The Registration Statement states,

18

"[f]ollowing these discussions, the SureWest board of directors determined that it was not in the best interests of SureWest and its shareholders to further pursue a possible transaction with Consolidated on the terms Consolidated had proposed."

67.     Despite having twice rejected Consolidated's proposal to purchase the Company for $18.00 per share, from October through December 2011, SureWest, through UBS, continued to have "informal discussions" with Currey regarding the sale of SureWest to Consolidated.  At the same time, the Board failed to aggressively negotiate a possible transaction with Company A and, through UBS, merely had "periodic discussions" to discuss SureWest's business.

68.     On December 8, 2011, Company A indicated that it would submit a purchase proposal in the range of $16.00 to $18.00 per share.  After Oldham replied that he did not believe that a proposal within this range would be accepted by the Board, Company A provided SureWest a written proposal to purchase all of the outstanding shares of SureWest for $18.00 per share in cash.

69.     On December 14, 2011, after reviewing and discussing Company A's proposal, as well as the other strategic alternatives SureWest had been considering, the Board concluded that $18.00 per share was not sufficient consideration but authorized management to continue discussions with Company A. Following such discussions, on December 18, 2011, Company A revised its purchase proposal to $20.00 per share in cash.

70.     On December 18, 2011, after reviewing and discussing Company A's revised proposal, the Board directed management and UBS to continue discussions with Company A based on the revised proposal. The Board further considered the proposal at its meeting held on December 21, 2011.  The Registration Statement does not disclose the Board's conclusions at December 21, 2011 meeting.

71.     Company A and SureWest engaged in due diligence meetings and exchanges from December 21, 2011 through January 2012.

72.     At the January 16, 2012 Board meeting, UBS noted that on January 13, 2012, Company A communicated that it had completed a majority of its diligence and reaffirmed its proposal to purchase all of the outstanding shares of SureWest for $20.00 per share in cash, subject to certain stipulations, including refusing to include a "go shop" provision allowing SureWest to solicit additional

offers following the signing of a merger agreement with Company A. At this meeting, the Board determined to proceed with the market check process and discussions with Company A concurrently. The Registration Statement fails to disclose that, based on the closing price of SureWest stock on January 13, 2012, Company A's offer would have provided SureWest shareholders with a premium of nearly 60%.

73.     Following its January 16, 2012 meeting, the Board directed UBS to contact 22 parties with which SureWest either had previous discussions regarding a possible transaction, including Consolidated, or that representatives of UBS and SureWest viewed as potentially interested parties. As a result of this process, Consolidated and three other parties executed confidentiality agreements, and received a packet of non-public information about SureWest. Each of the interested parties was requested to complete initial diligence and provide a written indication of interest by January 24, 2012.

74.     Beginning on January 18, 2012, Company A and SureWest began negotiating the terms of a merger agreement.

75.     Between January 16 and 24, 2012, SureWest management conducted diligence sessions and/or held meetings with management of two of the three other parties that had executed a confidentiality agreement in connection with the market check process.

76.     On January 24, 2012, Consolidated provided to SureWest a written proposal to acquire the Company for an indicated price of $22.00 per share, consisting of $11.00 in cash and $11.00 in shares of Consolidated common stock, subject to certain election and proration procedures and a collar to provide a fixed value for up to a 15% increase and 15% decrease in the trading price of Consolidated's stock. The proposal also included an offered right of SureWest to appoint one director to the Consolidated board of directors. The Registration Statement fails to inform shareholders that, based on the closing price of SureWest stock on January 24, 2012, Consolidated's offer would have provided SureWest shareholders with a premium of just over 50%.

77.     None of the three other parties that signed a confidentiality agreement in January 2012 ultimately submitted a proposal.

CLASS ACTION COMPLAINT

78.     At its January 25, 2012 meeting, the Board determined to move forward with concurrent negotiations with both Consolidated and Company A.

79.     Consolidated and SureWest began negotiating the terms of a merger agreement on January 26, 2012 – a process that included several meetings between the senior management of both companies and representatives from each company's financial adviser and counsel.

80.     At its special Board meeting held on February 2, 2012, the Board authorized management and representatives of UBS to continue negotiations with each of Consolidated and Company A and to seek a "best and final" offer from each party.

81.     After further negotiations with representatives from Company A and Consolidated on February 2 and 3, 2012, SureWest requested a "best and final" offer from each company by noon on February 4, 2012.

82.     During the evening of February 3, 2012, counsel for Company A submitted a letter reiterating its previous offer of $20.00 per share cash and stating that such offer was its "best and final" offer, together with a purportedly final version of the merger agreement and executed financing commitment papers with a nine month term. The letter stated that Company A had agreed to certain terms requested by SureWest, including a nine month financing commitment and an increased reverse termination fee. The offer letter further stated that the offer would expire in approximately three hours unless the Board approved the transaction and returned a countersigned merger agreement.

83.     Following receipt of Company A's communication, the Board held a special meeting and determined not to accept the offer on the terms presented by Company A without first considering the "best and final" offer from Consolidated expected the following day.

84.     At approximately 12:30 pm Eastern time on February 4, 2012, Consolidated sent a definitive offer letter reaffirming Consolidated's previous offer of $22.00 per share and stating that Consolidated had obtained a financing commitment with a nine month term. At its special meeting on February 4, 2012, without attempting to maximize the shareholder value by further negotiating with Company A and Consolidated, the Board indicated that it was supportive of a transaction with Consolidated at $22.00 per share and authorized management to move forward towards finalizing the

CLASS ACTION COMPLAINT

merger agreement and transaction with Consolidated, with the goal of entering into a binding agreement with Consolidated prior to the market open on Monday, February 6, 2012. The Board did not even inform Company A that it had received a higher offer in an attempt to negotiate a better proposal from Company A.

85.    Indeed, it was Company A that reached out to SureWest late in the evening of February 4, 2012, to inquire about the status of the Board of director's review of its offer. On the morning of February 5, 2012, Company A submitted an unsolicited revised definitive offer to acquire SureWest at a purchase price of $22.50 per share in cash.

86.    The Board responded to Company A's offer by directing UBS to inform Consolidated that SureWest had received an unsolicited superior offer earlier that day. Defendant Oldham also contacted Company A and confirmed that $22.50 per share was Company A's best and final offer.

87.    After being alerted to the higher offer presented by Company A, Consolidated quickly and willingly revised its offer to $23.00 per share, consisting of $11.50 in cash and $11.50 in shares of Consolidated stock.

88.    Following SureWest's receipt of this revised proposal, again, without contacting Company A in an attempt to improve that offer, the Board unanimously approved the Merger Agreement.

**D.    The Proposed Transaction**

89.    After the close of the market on February 5, 2012, SureWest and Consolidated executed the Merger Agreement, pursuant to which Consolidated would acquire all of the outstanding shares of SureWest in a cash and stock transaction deal valued at approximately $340.9 million, exclusive of debt. On February 6, 2012, prior to the opening of trading on NASDAQ, Consolidated and SureWest issued a joint press release announcing the Proposed Transaction. On February 7, 2012, each of the MergerSubs executed the Merger Agreement.

90.    Under the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, MergerSub I will merge with and into SureWest, whereupon the corporate existence of MergerSub I will terminate with the Company as the surviving corporation (the "First-Step Surviving

Company") and as a wholly-owned subsidiary of Consolidated (the "First Merger"). Within one business day after the First Merger, Consolidated will cause the First-Step Surviving Company to merge with and into MergerSub II, whereupon the corporate existence of the First-Step Surviving Company will cease, leaving MergerSub II as the surviving corporation.

91.     In exchange for each SureWest share, the Company's shareholders will receive either $23.00 in cash (without interest) or shares of Consolidated common stock having an equivalent value based on average trading prices for the 20-day period ending two days before the closing of the Proposed Transaction (the "Consolidated Trading Price"). Shareholders can elect which form of Merger Compensation to receive. Overall elections by SureWest shareholders are subject to proration so that 50% of the SureWest shares will be exchanged for cash and 50% for stock. In addition, the Stock Consideration is subject to a collar mechanism so that (i) if the number determined by dividing $23.00 by the Consolidated Trading Price is less than or equal to 1.03896, the exchange ratio shall be 1.03896, and (ii) if the number determined by dividing $23.00 by the Consolidated Trading Price is greater than or equal to 1.40565, the exchange ratio shall be 1.40565.

92.     Upon the consummation of the Proposed Transaction, it is expected that current SureWest holders will hold approximately 22% of all outstanding shares of Consolidated stock.

93.     In the February 6, 2012 joint press release issued by SureWest and Consolidated announcing the Proposed Transaction, Consolidated's President and CEO Robert J. Currey touted SureWest's financial soundness, stating: "SureWest has built one of the highest quality networks in the industry and transformed itself into a leading broadband provider."

**E.      Defendants' Deficient Disclosures**

94.     On March 28, 2012, Consolidated filed the Registration Statement with the SEC in connection with the Proposed Transaction. The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information, thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

95.     Specifically, as discussed below, the Registration Statement fails to disclose the underlying methodologies, projections, key inputs and multiples relied upon and observed by the

Company's financial advisors, UBS and Wells Fargo so that shareholders can properly assess the credibility of the various analyses performed by the advisors and relied upon by the Board in recommending the Proposed Transaction. The Registration Statement also fails to disclose potential material conflicts relating to UBS and Wells Fargo necessary for shareholders to determine the credibility and weight to give to these respective analyses.

**(1)   Internal Projections by Management**

96.    The Registration Statement should disclose, at minimum, the financial projections for SureWest for the years 2012 through 2016 prepared by the Company's management, including unlevered free cash flows, operating free cash flows, depreciation/amortization expense, capital expenditures, net operating losses, revenue, EBITDA and earnings, whether or not such projections were considered by the Board, UBS, or Wells Fargo.

97.    The Registration Statement should disclose, at minimum, the financial projections for Consolidated for the years 2012 through 2016 prepared by the Consolidated's management, including unlevered free cash flows, operating free cash flows, depreciation/amortization expense, capital expenditures, tax savings, net operating losses, revenue, EBITDA and earnings, whether or not such projections were considered by the Board, UBS, or Wells Fargo.

98.    As reflected by the Registration Statement, UBS relied on "certain estimates of synergies prepared by Consolidated's management and discussed with SureWest that were not publicly available that SureWest's board of directors directed UBS to utilize for purposes of its analysis." The Registration Statement should precisely describe the exact synergies, on a year-by-year basis, expected by Consolidated and/or SureWest, whether or not such projections were considered by the Board, UBS, or Wells Fargo.

**(2)   Material Omissions Concerning UBS and Its Financial Analyses**

99.    The Registration Statement should disclose the nature of the services that UBS provided to and the corresponding amount of fees that it received from SureWest, Consolidated, and any of the Individual Defendants in the past two years.

CLASS ACTION COMPLAINT

100.     The Registration Statement should disclose the cash amount and/or "portion" of the total fees that UBS received for providing its fairness opinion to SureWest.

101.     The Registration Statement should disclose all pricing metrics – other than the disclosed metrics of, for example, enterprise value ("EV") to EBITDA (and, in the case of the *Selected Public Companies Analysis*, also the EV to operating free cash flow ("OpFCF")) – that UBS considered in its analyses of the Proposed Transaction.

102.     With respect to the "*Selected Public Companies Analysis*," the Registration Statement should disclose the following material information:

(i)     The objective criteria UBS used to select the companies;

(ii)     The multiples observed for each of the selected companies; and

(iii)     The reason(s) UBS calculated enterprise values using debt and minority interests at "book value" but preferred stock at "liquidation value" and the difference between using "book value" versus "liquidation value."

103.     With respect to the "*Selected Transactions Analysis*," the Registration Statement should disclose the following material information:

(i)     The objective criteria UBS used to select the transactions, including UBS' rationale for including the September 8, 2008 sale of Morris Communications Co. LLC's 29% minority interest in Mediacom Communications Corp.;

(ii)     The multiples observed for each of the selected transaction; and

(iii)     The reason(s) UBS calculated EVs using debt and minority interests at "book value" but preferred stock at "liquidation value" and the difference between using "book value" versus "liquidation value."

104.     With respect to the "*Discounted Cash Flow Analysis*," the Registration Statement should disclose the following material information:

(i)     The definition of free cash flows;

CLASS ACTION COMPLAINT

    (ii)    The criteria UBS used to select a discount rate range of:(a) 9% to 11% for "SureWest Standalone"; and (b) 6.5% to 7.5% for "Consolidated Standalone"; and the reason(s) UBS used different discount rates;

    (iii)    The criteria UBS used to select (a) the 5.0x to 6.0x EBITDA terminal value multiples for "SureWest Standalone"; and (b) the 6.5x to 7.5x EBITDA terminal value multiples for "Consolidated Standalone"; and the reason(s) UBS used different EBITDA terminal value multiple ranges;

    (iv)    The criteria UBS used to select a discount rate range of 7.1% to 8.1% for "SureWest Pro Forma for the Mergers, based upon the Assumed Mixed Consideration"; and

    (v)    The criteria UBS used to select the 5.9x to 6.9x EBITDA terminal value multiples for its Discounted Cash Flow Analysis -- SureWest Pro Forma for the Mergers, based upon the Assumed Mixed Consideration.

**(3)**    **Material Omissions Concerning Wells Fargo's Financial Analyses**

105.    The Registration Statement should disclose the nature of the services that Wells Fargo provided to, as well as the amount of fees for such services that it received from, SureWest, Consolidated, and any of the Individual Defendants in the past two years.

106.    The Registration Statement should disclose the cash amount or "portion" of fees that Wells Fargo received for providing its fairness opinion and the "significant portion" it will receive if and when the merger is consummated.

107.    The Registration Statement should disclose all pricing metrics – other than the disclosed metrics of, for example, EBITDA – that Wells Fargo considered in its analyses of the Proposed Transaction.

108.    With respect to the "*Selected Publicly Traded Companies Analysis*," the Registration Statement should disclose the following material information:

    (i)    The objective criteria Wells Fargo used to select the companies;

    (ii)    The multiples observed for each of the selected companies;

(iii)    The high, low mean, and median multiples observed for each of the selected companies; and

(iv)    The basis for selecting the EV/calendar year 2012 estimated adjusted EBITDA multiples range of 5.5x to 7.5x used.

109.    With respect to the "*Selected Transactions Analysis*," the Registration Statement should disclose the following material information:

(i)    the criteria Wells Fargo used to select the transactions used; and

(ii)    The multiples observed for each of the selected transactions.

110.    With respect to the "*Discounted Cash Flow Analysis*," the Registration Statement should disclose the following material information:

(i)    The definition of free cash flows;

(ii)    The criteria used to select the perpetual free cash flow growth rate range of 1.0% to 3.0%, which is below the rate of inflation;

(iii)    The material key inputs Wells Fargo used to calculate SureWest's weighted average cost of capital ("WACC"), including betas, risk premiums, and assumed capital structure;

(iv)    The specific pre-tax synergy projections used by Wells Fargo; and

(v)    The specific estimated tax benefits used by Wells Fargo.

**(4)    Material Misrepresentations and Omissions Concerning the Sales Process**

111.    With respect to the Board's decision to explore SureWest's range of strategic alternatives in early 2009, the Registration Statement does not inform investors precisely when the Board authorized management to explore strategic alternatives, or what steps SureWest management undertook to explore various strategic alternatives between early 2009 and the third quarter of that year.

112.    With respect to the initial exploratory process conducted by UBS in the third quarter of 2009, the Registration Statement does not state how many parties were contacted by UBS during this time and SureWest's rationale for excluding potential financial buyers and limiting the search to potential strategic partners.

113.    Although the Registration Statement states that Defendant Oldham, SureWest's president and CEO, and Currey, Consolidated's president and CEO, have both served as directors of the USTelecom Association since 2006, it does not provide details concerning the interactions resulting from this association.  Specifically, the Registration Statement fails to disclose that, at board and annual meetings of USTelecom Association, "from time to time Mr. Oldham and Mr. Currey discussed the possibility of a transaction between SureWest and Consolidated,"  and fails to disclose certain material details concerning those discussions, including, *inter alia,* when those discussions began, which party initiated those discussions, whether the discussions ever occurred outside of USTelecom Association meetings and whether Defendant Oldham kept the Board informed of these discussions.

114.    Defendants fail to provide any details concerning the exchanges between SureWest and Consolidated during the second half of 2009, other than that Consolidated expressed an interest in a possible transaction with SureWest and executed a confidentiality agreement on December 1, 2009.

115.    With respect to each of the offers received by SureWest from Consolidated and Company A from February 2010 through January 2011, the Registration Statement fails to inform investors that the premium offered by each of those offers was significantly higher than the premium provided by the Merger Consideration.

116.    With respect to SureWest's and Consolidated's "mutual" agreement to terminate discussions concerning a possible business combination, at the end of March 2010, the Registration Statement fails to inform investors that between March 8 and March 31, 2010, SureWest stock declined approximately 11.8%, from the closing price of $9.74 per share to $8.59 per share, while Consolidated stock rose approximately 5.6%, from the closing price of $17.96 per share to $18.96 per share. It also fails to accurately describe which party ended the negotiations at this time.

117.    Throughout the description of the sales process, Defendants do not provide sufficient information concerning the "other strategic alternatives" being considered and the likelihood of success of each of those alternatives, the number of parties with whom SureWest and its agents were in discussions concerning a possible strategic transaction or sale of the company.

118.   The Registration Statement fails to explain whether any events occurred between August 24, 2011 and the end of October 2011 which precipitated the Board to again conclude – as it had on August 24, 2011 – that Consolidated's offer of $18.00 per share was insufficient.

119.   The Registration Statement does not indicate the Board's conclusions at the end of the December 21, 2011 meeting.

120.   The Registration Statement fails to inform investors as to why the three parties that had signed a confidentiality agreement in January 2012 – particularly the party that had "expressed a strong interest in a transaction" with SureWest – determined not to submit a proposal

**F.   The Proposed Transaction is Inadequate, Unreasonable and Unfair, and The Merger Agreement Precludes Potential Bidders from Entering into the Process**

121.   The Proposed Transaction is inadequate, unreasonable, unfair and not in the best interest of shareholders.  While the press release announcing the Proposed Transaction suggests that the premium provided under the Merger Agreement is generous, Consolidated's offer of approximately $23.00 per share does not adequately reflect SureWest's true worth as a takeover candidate.  As indicated in the Company's recent financial results and in management's recent comments, SureWest is positioned for long-term growth.  The inadequate consideration agreed to in the Merger Agreement calls into question the effectiveness of the Individual Defendants and their ability to secure a transaction that adequately captures the true value of the Company for its shareholders.

122.   The Proposed Transaction was driven by Defendant Oldham's close personal ties to Robert J. Currey, the President and CEO of Consolidated.  Rather than providing competing bidders with a level playing field, the Board agreed to a Merger Agreement that features several provisions which work to lock up the deal in favor of Consolidated and to discourage competing bidders from stepping forward with a superior alternative offer.

123.   Among other things, the Merger Agreement does this by failing to include a reasonable "go shop" period.  In fact, Section 7.7(a) of the Merger Agreement requires the Company and its agents to cease any discussions or negotiations concerning an alternative proposed offer for the sale of the

Company. Section 7.7 also expressly prohibits the Company and its representatives from directly or indirectly: (i) soliciting (including by way of furnishing non-public information), initiating or knowingly encouraging or facilitating any inquiry with respect to, or the making, submission or announcement of, any proposal or offer that constitutes, or is reasonably expected to lead to, an alternative sales proposal; (ii) furnishing a potential bidder with any non-public information relating to the Company and/or its subsidiaries, or affording to any such person access to the business, properties, assets, books, records or other non-public information, or to any personnel, of the Company and/or its subsidiaries, in any such case relating to an alternative sales proposal or any inquiries or the making of any proposal that could lead to an alternative sales proposal; (iii) engaging in, continuing, or otherwise participating in any discussions or negotiations regarding any alternative sales proposal with a potential bidder, except to notify such person as to the existence and content of the provisions of the "no solicitation" provision of the Merger Agreement; and (iv) granting any waiver, amendment or release under any standstill or confidentiality agreement (except for any portion of any such standstill or confidentiality agreement that restricts the ability of a person to communicate an alternative sales proposal to Company Board), or anti-takeover laws.

124. Before the Company may furnish confidential information to or enter into substantive discussions with an unsolicited bidder, Section 7.7(b) requires the following to occur: (i) the Company Board must determine in good faith (after consultation with its financial advisor and outside legal counsel) that the unsolicited bidder's offer is either superior to the Proposed Transaction (a "Superior Offer") or could reasonably be expected to result in a Superior Proposal; (ii) the unsolicited bidder must provide the Company with an executed confidentiality agreement; and (iii) the Company must notify Consolidated that it intends to furnish information or access to, or intends to enter into substantive discussions or negotiations with, the unsolicited bidder.

125. Moreover, Sections 7.7(b) and (e) require SureWest to: (i) provide Consolidated with any material non-public information concerning the Company and/or its subsidiaries that is provided to an unsolicited bidder; (ii) promptly notify Consolidated of any alternative offers received by the Company, indicating the material terms and conditions of any proposals or offers (including, if applicable, copies

of any written requests, proposals or offers, including proposed agreements); (iii) keep Consolidated reasonably informed, on a prompt basis, of the status and material terms of any such proposals or offers (including any material amendments thereto), including any change in the Company's intentions as previously notified; and (iv) promptly notify Consolidated if any non-public information is requested from, or any discussions or negotiations are sought to be initiated or continued with, the Company, indicating the status of any such discussions or negotiations.

126.    Further, a competing bidder will need to negotiate with a management team participating in the Proposed Transaction (as explained below), the members of which are already heavily biased in favor of consummating the Proposed Transaction.  If tenacious enough to navigate this obstacle course, that bidder will be further discouraged by the onerous termination fee that the Company (and by extension, the "successful" competing bidder) will be forced to pay. The termination fee is $14,675,000, which is approximately 4.3% of the total value of the Proposed Transaction.

127.    Even if the Company receives an unsolicited acquisition proposal that is superior to the deal with Consolidated, Sections 7.7(d) and (e) of the Merger Agreement prevent the Board from accepting the Superior Offer and terminating the Proposed Transaction unless, *inter alia*: (i) the Board determines in good faith (after consultation with its financial advisor and outside legal counsel) that failure to accept the Superior Offer and to terminate the Proposed Transaction would be inconsistent with the directors' exercise of their fiduciary obligations to the shareholders of the Company under applicable laws; and (ii) pays Consolidated the hefty Termination Fee.

128.    Accordingly, the Proposed Transaction is wrongful, unfair and harmful to the Company's public shareholders, and represents an attempt to deny Plaintiff and the other members of the Class their right to obtain their fair, proportionate share of the Company's valuable assets, future growth in profits, earnings and dividends.

129.    As a result of Defendants' unlawful actions, Plaintiff and the other members of the Class will be damaged in that they will not receive their fair portion of the value of the Company's assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

**THE PROPOSED TRANSACTION PROVIDES SPECIAL BENEFITS TO INSIDERS**

130.    Each of the Individual Defendants and the Company's executive officers are conflicted and in breach of their fiduciary duties because they will receive benefits from the Proposed Transaction not available to Plaintiff and the other public shareholders of SureWest.

131.    As indicated by the memorandum to SureWest employees addressing frequently asked questions ("FAQs") relating to the Merger Agreement, which was filed with the SEC as an exhibit to its Form 8-K on February 6, 2012, members of SureWest's management will retain their positions, given that "the businesses in the Sacramento and Kansas City regions will still require good people to deliver services."

132.    Moreover, the Merger Agreement provides for "accelerated vesting," *i.e.*, all stock options, restricted stock units ("RSU") and restricted stock awards ("RSA") will fully accelerate and vest upon consummation of the Proposed Transaction, thereby allowing the Individual Defendants and certain Company insiders to receive compensation in the form of Merger Consideration for restricted securities that would otherwise be unmarketable. Specifically, if the Proposed Transaction is completed:

(i)    holders of the stock options will receive a cash payment (without interest) with respect thereto equal to the product of (i) the excess, if any, of the Cash Consideration over the exercise price per share of such Company stock option; and (ii) the number of shares of Company stock issuable upon exercise of such Company stock option;

(ii)    all SureWest RSUs will become fully vested at the time of the closing of the First Merger and will be automatically cancelled and the holder thereof will receive a cash payment (without interest) with respect thereto equal to the product of $23.00 multiplied by the number of shares of SureWest Common Stock subject to such RSU. Each SureWest RSU that is subject to Section 409A of the Internal Revenue Code will be settled in cash pursuant to the terms of the applicable award agreement and, therefore, the holder thereof will receive a cash payment (without interest) of $23.00 per share of SureWest Common Stock issuable pursuant to such restricted stock unit at the time prescribed by the applicable award agreement; and

(iii)    all SureWest RSAs will become fully vested at the time of the closing of the First Merger and will be automatically cancelled and the holder thereof will receive a cash payment (without interest) with respect thereto equal to the product of (i) $23.00; and (ii) the number of shares of SureWest Common Stock subject to such RSA.

133.    Notably, through the benefits available under the change of control severance agreements in place, Oldham will be entitled to receive the following upon the completion of the Proposed Transaction:

| Name | Cash ($) | Equity ($) | Perquisites/ Benefits ($) | Total ($) |
|---|---|---|---|---|
| Steven C. Oldham | 3,000,000[2] | 4,973,853[8] | 60,284 | 8,034,137 |

134.    Under SureWest's applicable equity plan and the stock option, RSU and RSA agreements, and through the accelerated vesting provisions of the Merger Agreement, members of the Board will also be entitled to special benefits.  Specifically, the table below sets forth the intrinsic value of the acceleration of the unvested stock options, RSUs, and RSAs held by the non-employee directors, and the intrinsic value of any vested stock options, RSUs and/or RSAs and other shares held by such director, that each of these directors will be entitled to receive upon the completion of the Proposed Transaction:

| Name | Value of Other Shares Owned $ | Total Value $ |
|---|---|---|
| Kirk C. Doyle | 4,573,619 | 4,573,619 |
| Guy R. Gibson | 1,516,712 | 1,516,712 |
| Robert D. Kittredge | 782,161 | 782,161 |
| John R. Roberts III | 862,109 | 862,109 |
| Timothy D. Taron | 831,427 | 831,427 |
| Roger J. Valine | 1,227,878 | 1,227,878 |

135.    Finally, Section 7.6 of the Merger Agreement requires Consolidated to indemnify the Company's directors and employees for a period of six years following the close of the Proposed Transaction for all liabilities or claims related to their service or employment with SureWest or its

33

subsidiaries occurring prior to the close of the Merger. This covenant further requires Consolidated to keep in place the Company's directors' and officers' liability insurance policies ("D&O Insurance") in effect at the closing, or purchase a "tail policy" offering coverage at least as favorable as the Company's existing D&O Insurance.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in SureWest.

138.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have violated their fiduciary duties by contractually preventing themselves from obtaining higher offers from other interested buyers and attempting to unfairly deprive Plaintiff and the other members of the Class of the true value of their investment in SureWest.

139.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the Class.

140.    As demonstrated by the allegations above, the Individual Defendants have breached their duties of care, loyalty, candor, good faith and independence owed to the public shareholders of SureWest by, *inter alia*, failing to take steps to maximize the value of SureWest to its public shareholders and attempting to improperly put their personal interests ahead of the interests of SureWest shareholders.

141.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they will not receive their fair portion of the value of SureWest's assets and businesses and will be prevented from obtaining fair value for their investment.

142.   The Individual Defendants have capitulated to Consolidated's self-serving importuning and are not acting in good faith toward Plaintiff and the other members of the Class.   Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, to the irreparable harm of the members of the Class.

143.   Plaintiff and the members of the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### Claim for Aiding and Abetting Against All Defendants

144.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.   Defendants have acted and are acting with knowledge, or with reckless disregard, of the fact that the Individual Defendants are in breach of their fiduciary duties to SureWest's public shareholders, and have participated in such breaches of fiduciary duties.

146.   Defendants have knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.   In so doing, Defendants rendered substantial assistance in order to effectuate the Merger Agreement in breach of the Individual Defendants' fiduciary duties.

147.   Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring this action to be a proper class action and certifying Plaintiff as Class representatives and Plaintiff's counsel as Class counsel;

B.   Declaring that Defendants, including the Individual Defendants, have breached their fiduciary duties, and/or aided and abetted such breaches, to Plaintiff and the Class;

C.   Declaring that the Merger Agreement and Proposed Transaction was entered into by breach of Defendants' fiduciary duties and is therefore unlawful and unenforceable;

35

D.      Preliminarily and permanently enjoining all Defendants and all those acting in concert with them from consummating the Proposed Transaction unless the Company makes full and necessary disclosure to SureWest's public shareholders and until such time, as any, that the Individual Defendants have adequately undertaken all appropriate and available methods to maximize shareholder value;

E.      In the event that the Proposed Transaction is consummated, rescinding it and/or awarding actual and punitive damages to Plaintiff and the Class, including pre- and post-judgment interest;

F.      Awarding Plaintiff his fees and expenses in connection with this litigation, including reasonable attorneys' and experts' fees and expenses;

G.      Granting a trial by jury on all claims; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 18, 2012                    Respectfully submitted,

**FINKELSTEIN THOMPSON LLP**

By: /s/ Rosemary M. Rivas
Rosemary M. Rivas
Danielle A. Stoumbos
100 Bush Street, Suite 1450
San Francisco, California 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704

Robert O. Wilson
1077 30th Street, N.W.
Suite #150
Washington, DC 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

CLASS ACTION COMPLAINT